FILED

FEB 13 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----ooOoo----

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR. S-99-0433 WBS |
| Plaintiff, | |
| v. | MEMORANDUM AND ORDER RE: DEFENDANT JOHN THAT LUONG'S MOTION TO DISMISS BASED ON SELECTION OF TRIAL JURY |
| JOHN THAT LUONG, et. al. | |
| Defendants. | |

----ooOoo----

Defendant John That Luong is one of seven defendants named in the indictment in this case. Luong now moves to dismiss his indictment, or in the alternative, for a stay of proceedings, on the grounds that the racial composition of the jury wheel from which his trial jury is to be selected violates the Jury Selection and Service Act of 1968 and the Equal Protection Clause ("JSSA").[1]

---

[1] Co-defendants Minh Huynh and Son Van Nguyen have joined formally in this motion. The court further understands that all other defendants with the exception of Bao Lu, who apparently for tactical reasons related to his speedy trial and severance motions has expressly declined to join in this and other pretrial

I.   Jury Selection and Service Act

Luong has presented a declaration from demographer John R. Weeks stating that African-Americans, Hispanics, and "all minority groups combined" are underrepresented in the 2002 jury wheel for the Sacramento division of the Eastern District of California. (Weeks Decl. ¶ 5). Based on this declaration, Luong alleges violations of the JSSA.

A.   28 U.S.C. § 1861

Under 28 U.S.C. § 1861, "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." The test for a constitutionally selected jury is the same whether challenged under the Sixth Amendment or under the JSSA. United States v. Sanchez-Lopez, 879 F.2d 541, 546-47 (9th Cir. 1989). In Duren v. Missouri, 439 U.S. 357 (1979), the Supreme Court articulated a three-part test for determining the constitutionality of jury selection under the Sixth Amendment.

> [T]o establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

Id. at 365.

///

---

motions, join informally in the motion.

### 1. "Distinctive" Group

To show that a group is "distinctive" under the first prong of the Duren test, the defendant must establish "(1) that the group is defined and limited by some factor (i.e., that the group has a definite composition such as by race or sex), (2) that a common thread or basic similarity in attitude, ideas, or experience runs through the group, and (3) that there is a community of interest among members of the group such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process." United States v. Fletcher, 965 F.2d 781, 782 (9th Cir. 1992).

Here, Luong alleges that the 2002 jury wheel underrepresents African-Americans, Hispanics, and a group consisting of "all minority groups combined." (Def.'s Mot. at 5). There is no question that African-Americans and Hispanics are cognizable "distinctive" groups under Duren. See United States v. Cannady, 54 F.3d 544, 547 (9th Cir. 1995); United States v. Suttiswad, 696 F.2d 645, 648 (9th Cir. 1982). However, the Ninth Circuit has rejected the theory that all non-white groups can be combined to form a single "distinctive" group for the purpose of a jury selection challenge. As the court reasoned in Suttiswad:

> Defendant suggests that this Court should "add up" all of the separate figures of minority underrepresentation in order to arrive at one figure for underrepresentation of "non-whites" . . . . No authority is presented for the argument that "non-whites" should be recognized as a separate "ethnic group" for this purpose. . . . Any group which might casually be referred to as "non-whites" would have no internal cohesion, nor would it be viewed as an identifiable class by the general population. Certainly the members of such group would have "diverse

1     attitudes and characteristics which would defy
2     classification."

3 Suttiswad, 696 F.3d at 649 (quoting United States v. Kleifgen, 557 F.2d 1293, 1297 (9th Cir. 1977)).  Accordingly, Luong has established only African-Americans and Hispanics as "distinctive" groups within the meaning of the Duren test.

        2.   "Substantial Underrepresentation"

        In order to meet the second prong of the Duren test, "[o]ne claiming underrepresentation of a distinctive group must . . . present data showing that the percentage of persons in that group in the jury wheel is significantly lower than the percentage eligible to serve on juries."  United States v. Artero, 121 F.3d 1256, 1262 (9th Cir. 1997); see United States v. Esquivel, 88 F.3d 722, 726-27 (9th Cir. 1996).  In evaluating such data, the Ninth Circuit relies on "absolute disparity" statistics, calculated by taking the percentage of the group at issue in the total jury-eligible population and subtracting from it the percentage of that group that is represented on the master jury wheel.  See Artero, 121 F.3d at 1260-1262; Esquivel, 88 F.3d at 727.  The Ninth Circuit has "consistently held that absolute disparities below 7.7 percent are insubstantial and constitutionally permissible."  Cannady, 54 F.3d at 548; Sanchez-Lopez, 879 F.2d at 548; Suttiswad, 696 F.2d at 648.

        According to Weeks' study of the 2002 jury wheel, Hispanics represent 10.3 percent of the jury-eligible population in this division and 7.1 percent of the jury pool, thus producing an absolute disparity of 3.2 percent.  (Weeks Supp. Decl., Attachment A).  Weeks also determined that African-Americans

4

1  represent 6.5 percent of the jury-eligible population in this
2  division and 3.5 percent of the jury pool, thus producing an
3  absolute disparity of 3.0 percent.  (Id.).
4       Luong concedes, as he must, that the absolute disparity
5  figures produced by his expert witness fall below the 7.7 percent
6  threshold that this circuit has held to be "insubstantial and
7  constitutionally permissible."  Cannady, 54 F.3d at 548.  Luong,
8  however, urges the court to consider a comparative disparity
9  analysis, calculated by "divid[ing] the absolute disparity
10 percentage by the percentage of the distinctive group in the
11 total population."  Thomas v. Borg, 159 F.3d 1147, 1150 (9th Cir.
12 1998).[2]  Notwithstanding Luong's insistence that comparative
13 disparity analysis is "a necessary counterweight" to absolute
14 disparity analysis (Def.'s Mot. at 5), "the comparative disparity
15 test is strongly disfavored in the Ninth Circuit on the grounds
16 that it exaggerates the effect of any deviation."  Borg, 159 F.3d
17 at 1151; see also Sanchez-Lopez, 879 F.2d at 548 ("We have
18 consistently favored an absolute disparity analysis and have
19 rejected a comparative disparity analysis.").
20      3.  "Systematic Exclusion"
21      The court's application of the Duren test ends with
22 Luong's concession that his expert's absolute disparity figures
23 fall within the constitutional limits set by this circuit.
24 However, even if Luong had met his burden of showing substantial
25 underrepresentation, he would still have to show that it is due

---

[2]      Under a comparative disparity analysis, the 2002 jury wheel underrepresents African-Americans by 47 percent, and Hispanics by 31 percent.  (Weeks Supp. Decl., Attachment A).

1  to systematic exclusion of African Americans or Hispanics in the
2  jury selection process.  He has not done so.
3         As the Fourth Circuit noted in Truesdale v. Moore, 142
4  F.3d 749, 755 (4th Cir. 1998), more than substantial
5  underrepresentation of a distinctive group is required to
6  establish a violation of the "fair cross-section" guarantee of
7  the Sixth Amendment.  Citing United States v. Cecil, 836 F.2d
8  1431, 1445 (4th Cir. 1998)(en banc), the Fourth Circuit held,
9  "The use of voter registration lists 'has been consistently
10 upheld against both statutory and constitutional challenges,
11 *unless the voter list in question had been compiled in a*
12 *discriminatory manner.*"  See also United States v. Ireland, 62
13 F.3d 227 (8th Cir. 1995)(evidence of underrepresentation without
14 more failed to establish that Native Americans were
15 systematically excluded); Schanbarger v. Macy, 77 F.3d 1424 (2nd
16 Cir. 1996)(absent positive evidence that some groups had been
17 hindered in attempting to register to vote, a jury venire drawn
18 from voter registrations lists did not violate the fair cross-
19 section requirement of the Sixth Amendment); United States v.
20 Ashley, 54 F.3d 311, 314 (7th Cir. 1995); Ford v. Seabold, 841
21 F.2d 677, 685 (6th Cir. 1988).
22         Despite being given unlimited authority by the court,
23 at taxpayer expense, to employ whatever experts, gather whatever
24 data, conduct whatever investigation, and spend whatever time and
25 money might be necessary, Luong has come forward with no evidence
26 to suggest that either African Americans or Hispanics are
27 hindered in attempting to register to vote, discriminated
28 against, barred from participation in jury venires, or otherwise

systematically excluded from the jury selection process in this district.

B. 28 U.S.C. § 1863(b)(2)

Luong directs the court's attention to Weeks' opinion that minority underrepresentation in the 2002 jury wheel "is the direct result of the way in which the jury pool is created, using only lists of registered voters without supplementation from other sources which would more fairly represent a cross-section of the jury-eligible population in the District." (Def.'s Mot. at 3).

Specifically, Weeks volunteers the recommendation that the court "replace its current system of using only the file of registered voters and, instead, supplement that list by merging it with the lists from the Department of Motor Vehicles." (Weeks Supp. Decl. ¶ 20). The only evidence he offers to suggest that such a modification to the court's plan would increase the representation of minorities is the fact that he has only twice found a statistically significant disparity after a court merged its list of registered voters with the Department of Motor Vehicles ("DMV") lists, and those were both in Los Angeles County. The main fallacy with that reasoning is that he does not tell us how many times, if ever, he has found that there was <u>not</u> a statistically significant disparity. Moreover, as discussed below, by standards set forth in Ninth Circuit case law there is no legally significant disparity here.

The reliability of Professor Weeks' "advocacy research" has been called into question by the Ninth Circuit in the past. See <u>Artero</u>, 121 F.3d at 1262. His analysis here is as

7

ineffective as it has been in the past.

At the outset, this court notes that it has an affirmative and independent obligation under 28 U.S.C. § 1863(a) to assure that its jury plan complies fully with the Constitution and all applicable provisions of Title 28 of the United States Code. In attending to that obligation the court has many times heard and considered the suggestion that its list of registered voters be merged with lists from the DMV. The suggestion is most typically made by those who represent defendants in criminal cases. It is generally agreed by all concerned that such a process involves additional challenges in avoiding duplicate listings and assuring that non-citizens, felons, and other non-qualified individuals from the DMV lists are culled from the merged list. It is generally acknowledged, however, that at significantly increased expense and administrative burden those problems can be resolved. See United States v. Coronell-Leon, 973 F. Supp. 1094 (D. Neb. 1997). It is also generally acknowledged that creation of such a merged list would ultimately result in a larger jury pool--i.e., include more people.

However, it is not at all clear that such a merged list would increase the representation of African Americans, Hispanics, or any other minorities in the jury venire. To the contrary, some research has indicated that supplementation of the jury list by such a method may decrease minority representation. See 5 Crim. Proc. § 22.2(a)(2d ed.); Bueker, Note, "Jury Source Lists: Does Supplementation Really Work?" 82 Cornell Law Review 390 (1977).

What *is* clear to this court is that supplementation of

the list of registered voters with the names of persons who for whatever reasons have chosen not to register to vote will increase the percentage of apathetic individuals in the venire. The same pool is used to select the jurors who will hear complex civil cases as is used to select those who will hear criminal cases. While apathetic jurors may be more desirable from the defense side in criminal cases, it would be a mistake to assume that they will make better jurors for any of the parties in other cases. It would also be a mistake to assume that forcing jury service upon persons who do not have enough public spirit even to register to vote would promote the policy that all citizens be afforded the opportunity to be considered for jury service. Any citizen wishing to be considered for jury service need only register to vote, a very simple task, especially compared with the process of registering with the DMV for a driver's licence.

Rather than supplement its list of jurors with names from the DMV, this court has concluded that the better way to enlarge the jury pool is an outreach program to encourage all qualified individuals, not just certain minority groups, to exercise their rights as citizens to register to vote. That is the course of action this court has elected to pursue, long before Luong's motion was made.

28 U.S.C. § 1863(b)(2) indeed requires that a plan for random jury selection "shall prescribe some other source or sources of names by some other source or sources of names in addition to voter lists where necessary to foster and policy and protect the rights secured by sections 1861 and 1862 of this title." By its terms, § 1863(b) requires the use of other

sources only when necessary to foster the policies and protect the rights secured by sections 1861 and 1862.[3] The question therefore becomes whether supplementation of the registered voters lists from other sources is necessary to foster those policies and protect those rights.

There is clear statutory authority for the exclusive use of voter registration lists in compiling the juror names. In the JSSA, "Congress designated voter registration lists (or lists of actual voters) as the main source for selecting potential jurors." Esquivel, 88 F.3d at 725; see also United States v. Brady, 579 F.2d 1121, 1134 (9th Cir. 1978) ("Voter lists were chosen because they provide the best available residential lists for a community and are constantly updated."). Further, the Ninth Circuit has found that Congress had specifically rejected the notion that juror selection from voter registration lists discriminates against groups whose members register to vote in lower proportion than the rest of the population. Brady, 579 F.2d at 1121-31. As expressed by the House Judiciary Committee:

> In a sense the use of voter lists as the basic source of juror names discriminates against those who have the requisite qualifications for jury service but who do not register or vote. This is not unfair, however, because anyone with minimal qualifications - qualifications that are relevant to jury service - can cause his name to be placed on the lists simply by registering or voting. No economic or social characteristics prevent one who wants to be considered for jury service from having his name placed in the

---

[3] Section 1861 sets forth the policies that all litigants shall have the right to juries selected at random from a fair cross section of the community and that all citizens shall have the opportunity to be considered for jury service. Section 1862 prohibits exclusion of jurors on account of race, color, religion, sex, national origin, or economic status.

10

1   pool from which jurors are selected.
2   1968 U.S. Code Cong. & Admin. News, p. 1795.

While the JSSA does require the supplementation of voter lists when "necessary" to further the goals of the JSSA, the Ninth Circuit has found that "[the Act] and its legislative history clearly contemplate that the use of sources other than voter lists will be the exception rather than the rule." United States v. Ross, 468 F.2d 1213, 1216 (9th Cir. 1972). In order to prove that supplementation is necessary, the defendant must show that use of the voter registration lists "resulted in a substantial underrepresentation in the jury pool of a cognizable group in the community." Kleifgen, 557 F.2d at 1296; see also Brady, 579 F.2d at 1131 ("The legislative history indicates that use of supplemental sources should be used only when the voter lists deviate substantially from the makeup of the local community.").

As discussed, Luong has conceded that the absolute disparity between the jury eligible Hispanic population and the 2002 jury wheel is 3.2 percent, while the absolute disparity for African-Americans is 3.0 percent. These numbers fall below the 7.7 percent threshold found to be constitutionally permissible. Cannady, 54 F.3d at 548. Accordingly, the use of voter registration lists as the sole source for selecting jurors in this district does not violate 28 U.S.C. § 1863(b)(2).

II. Equal Protection

In order to establish a prima facie case that a jury selection procedure violates equal protection, the defendant must: (1) establish that the defendant belongs to a group that is

"a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied;" (2) prove the degree of underrepresentation "by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time;" and (3) show discriminatory intent. Esquivel, 88 F.3d at 725 (citing Castaneda v. Partida, 430 U.S. 482, 494 (1977)).

Here, Luong is clearly unable to make out a prima facie equal protection violation. First, Luong, who along with his co-defendants is of Asian descent, does not allege that the jury selection procedure has resulted in the "underrepresentation of the race or identifiable group to which he belongs." Castaneda, 430 U.S. at 494. Rather, Luong alleges the underrepresentation of African-Americans and Hispanics, groups to which Luong and his co-defendants have not claimed membership. Even if Luong were either African-American or Hispanic, he has provided no evidence, or even argued, that these groups have been singled out for different treatment under the jury selection laws of this division.

Second, Luong has failed to establish "the most crucial factor in an equal protection case" - discriminatory intent. Esquivel, 88 F.3d at 727. The Supreme Court has found discriminatory intent in selection procedures that are "susceptible of abuse or [are] not racially neutral." Id. (citing Castaneda, 430 U.S. at 494). The Supreme Court has found opportunity for abuse in juror selections systems that hinge on the subjective judgment of juror commissioners. See, e.g., Castaneda, 430 U.S. at 494 (finding prima facie equal protection

12

violation in a selection system wherein jury commissioners personally select citizens from the community to be members of the jury pool); <u>Alexander v. Louisana</u>, 405 U.S. at 628 (finding opportunity for abuse in jury selection system wherein jury commissioners personally "culled" out approximately 5,000 of 7,374 questionnaires which contained racial designations).

     Nothing has been presented which demonstrates or even intimates that the process by which citizens may register to vote in California or by which they are selected for jury service in this district is susceptible of abuse or is not racially neutral. As discussed above, the jury selection method used in this district is that which is prescribed by the JSSA and permissible under 18 U.S.C. § 1863(b)(2). Accordingly, Luong has failed to establish a prima facie equal protection violation.

     IT IS THEREFORE ORDERED that defendant John That Luong's motion to dismiss the indictment or stay proceedings on the grounds that the racial composition of the jury wheel from which his trial jury is to be selected violates the Jury Selection and Service Act of 1968 and the Equal Protection Clause be, and the same hereby is, DENIED.

DATED: February 13, 2003

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

13

```
                    United States District Court
                              for the
                    Eastern District of California
                         February 13, 2003
```

* * CERTIFICATE OF SERVICE * *

2:99-cr-00433

USA

    v.

Luong

_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on February 13, 2003, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

```
     William Sze Wong                        SH/WBS
     United States Attorney
     501 I Street                            P. Sandlin
     Suite 10-100
     Sacramento, CA  95814

     Patrick Hanly
     United States Attorney
     501 I Street
     Suite 10-100
     Sacramento, CA  95814

     Richard B Mazer
     Law Offices of Richard B Mazer
     99 Divisadero Street
     San Francisco, CA  94117

     Jan David Karowsky
     716 19th Street
     Suite 100
     Sacramento, CA  95814-0710

     Gail R Shifman
     Law Offices of Gail Shifman
     632 Commercial Street
     Second Floor
```

San Francisco, CA  94111

Shari G Rusk
Law Offices of Shari Rusk
1710 Broadway
Suite 111
Sacramento, CA  95818

Jeffrey L Staniels
Federal Defender
801 K Street
Suite 1024
Sacramento, CA  95814

Michael Bradley Bigelow
Law Offices of Michael Bradley Bigelow
428 J Street
Suite 358
Sacramento, CA  95814-6908

James Ralph Greiner
Law Offices of James R Greiner
555 University Avenue
Suite 290
Sacramento, CA  95825

George C Boisseau
Law Offices of George C Boisseau
50 Santa Rosa Avenue
Fifth Floor
Santa Rosa, CA  95404

SERVICE BY INTER OFFICE:

 US MARSHAL        PROBATION        PRETRIAL    SERVICES

                                        Jack L. Wagner, Clerk

                                    BY: _____
                                        Deputy Clerk